**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| US GREEN BUILDING COUNCIL, INC, ) | |
| ) | |
| **Plaintiff,** ) | |
| vs. ) | No. 3:14-CV-01541-M-BH |
| ) | |
| **DAVID E. WARDELL, doing business** ) | |
| **as Leed International, LLC, doing** ) | |
| **business as Wardell Consulting, LLC,** ) | |
| ) | |
| **Defendant.** ) | Referred to U.S. Magistrate Judge |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Pursuant to the order of reference dated February 4, 2015 (doc. 35), this case has been referred for pretrial management, including the determination of non-dispositive motions and the issuance of findings, conclusions, and recommendations on dispositive motions. Before the Court is *Plaintiff's Motion for Entry of Default Judgment Against David E. Wardell*, filed October 12, 2015 (doc. 52). Based on the relevant filings and applicable law, the motion should be **GRANTED**.

**I. BACKGROUND**

On April 28, 2014, U.S. Green Building Council, Inc. (Plaintiff), sued Leed International, LLC (Leed), for trademark infringement, trademark dilution, unfair competition, false advertising, and cybersquatting. (doc. 1 at 12-22.)[1] The trademark claims related to infringement of Plaintiff's (1) LEED trademark, U.S. Reg. No. 2,763,993; (2) LEED family of marks, U.S. Reg. Nos. 3,495,463, 3,775,137, 3,818,881, 3,818,882, 3,953,333, 3,953,334, 3,953,335, and 4,474,675; (3) U.S. Green Building Council design marks, U.S. Reg. Nos. 3,407,162 and 3,407,163 (USGBC

---

[1] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

design marks); and (4) tagline "Leadership in Energy & Environmental Design" (LEED tagline).[2] (docs. 27 at 6-8, 10; 52-1 at 7.) The cybersquatting claims related to Defendant's registered domain names <leedintl.com> and <leedintl.net>. (docs. 27 at 10; 52-1 at 9.)

After receiving an extension of time to respond, David E. Wardell, on behalf of Leed, filed an answer on August 22, 2014. (*See* docs. 15, 16.) Plaintiff's motion to strike the answer was granted on November 12, 2014, and Leed was ordered to file a response that complied with the Federal Rules of Civil Procedure within two weeks. (doc. 21.) Leed filed a motion to dismiss on November 25, 2014, and an amended answer on December 3, 2014. (docs. 22, 25.)

After being granted leave, Plaintiff amended its complaint to name David E. Wardell, d/b/a Leed International, LLC, d/b/a Wardell Consulting, LLC (Defendant) as the sole defendant on December 12, 2014. (docs. 26, 27.) The Clerk of Court issued a summons for Defendant that same day. (doc. 28.) On December 18, 2014, Leed's motion to dismiss was denied as moot because it was no longer named as a defendant in the amended complaint. (doc. 30.) On December 19, 2014, Plaintiff filed proof of service indicating that Defendant had been personally served on December 17, 2014. (doc. 31.) After Defendant failed to timely answer, Plaintiff sought entry of default on January 22, 2015, and the Clerk entered default that same day. (docs. 32, 33.) On February 3, 2015, Defendant filed what was liberally construed as a motion to set aside entry of default and for an extension of time to answer. (docs. 34, 36, 44.) On September 1, 2015, Defendant's motion was granted, and he was given leave to answer or otherwise defend the suit within 21 days of that day. (doc. 46.)

---

[2] Plaintiff's amended complaint also asserts rights to U.S. Reg. Nos. 3,407,161 and 3,589,960, but it has stopped using and is in the process of cancelling the marks, and they are not addressed in Plaintiff's motion for default judgment. (doc. 52-1 at 2 n.2.)

After Defendant again failed to timely answer or otherwise defend, Plaintiff sought entry of default on October 7, 2015, and the Clerk entered default that same day. (docs. 50, 51.) On October 12, 2015, Plaintiff moved for default judgment. (doc. 52.) Defendant has not responded,[3] and the motion is now ripe for recommendation.[4]

## II. DEFAULT JUDGMENT

Plaintiff moves for default judgment under Fed. R. Civ. P. 55. (*See* doc. 52-1 at 10.)

**A.  Prerequisites**

Rule 55 sets forth a three-step process for securing a default judgment. *See* Fed. R. Civ. P. 55; *New York Life Ins. Co. v. Brown*, 84 F.3d 137, 141 (5th Cir. 1996). First, a default occurs when a party "has failed to plead or otherwise defend" against an action. Fed. R. Civ. P. 55(a). Next, an entry of default must be entered by the clerk when the default is established "by affidavit or otherwise." *See id.*; *New York Life Ins. Co.*, 84 F.3d at 141. Third, a party may apply to the clerk or the court for a default judgment after an entry of default. Fed. R. Civ. P. 55(b); *New York Life Ins. Co.*, 84 F.3d at 141.

Here, Defendant failed to plead or otherwise defend after being granted an extension to answer on September 1, 2015. (*See* doc. 46.) Additionally, Plaintiff obtained an entry of default from the clerk on October 7, 2015. (*See* docs. 50, 51.) Accordingly, the first two requisites for a default judgment have been met.

---

[3] On October 28, 2015, the order setting Defendant's deadline to respond to *Plaintiff's Motion for Entry of Default Judgment Against David E. Wardell*, which was mailed to Defendant at his provided address by the clerk's office, was received back as Return to Sender Vacant Unable to Forward. (*See* doc. 53.)

[4] Plaintiff filed *Plaintiff's Supplement to Motion for Entry of Default Judgment*, on November 16, 2015 (doc. 57.) Under the local rules, however, "a party may not, without the *permission* of the presiding judge, file supplemental pleadings, briefs, authorities, or evidence." L.R. 56.7 (emphasis added). Because Plaintiff filed its supplemental document without leave, it will not be considered.

"Default judgments are a drastic remedy, not favored by the Federal Rules and resorted to by courts only in extreme situations." *Lewis v. Lynn*, 236 F.3d 766, 767 (5th Cir. 2001) (quoting *Sun Bank of Ocala v. Pelican Homestead & Sav. Ass'n*, 874 F.2d 274, 276 (5th Cir. 1989)). Moreover, "a party is not entitled to a default judgment as a matter of right, even where the defendant is technically in default." *Id.* (quoting *Ganther v. Ingle*, 75 F.3d 207, 212 (5th Cir. 1996) (per curiam)). Default judgment "should not be granted on the claim, without more, that the defendant had failed to meet a procedural time requirement." *Mason & Hanger-Silas Mason Co. v. Metal Trades Council of Amarillo*, 726 F.2d 166, 168 (5th Cir. 1984) (per curiam). The decision to enter a judgment by default is discretionary. *Stelax Indus., Ltd. v. Donahue*, No. 3:03-CV-923-M, 2004 WL 733844, at *11 (N.D. Tex. Mar. 25, 2004).

Courts consider numerous factors in deciding whether to grant a motion for default judgment. *Flores v. Koster*, No. 3:11-CV-0726-M-BH, 2013 WL 357610, at *2 (N.D. Tex. Jan. 3, 2013), *adopted by* 2013 WL 362811 (N.D. Tex. Jan. 30, 2013) (citing 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2685 (3d ed. 1998)). The applicable factors include: (1) the amount of money involved; (2) whether there are material issues of fact or issues of substantial public importance at stake; (3) whether the default is technical in nature; (4) the extent of prejudice to the plaintiff due to the delay; (5) whether the grounds for default are clearly established; (6) the harsh effect of a default judgment; (7) whether the default resulted from a good faith mistake or excusable neglect on the defendant's part; (8) whether the plaintiff's actions contributed to delay; and (9) whether the court would be obligated to set aside the default on motion by the defendant. *Id.*; *see also Stelax Indus., Ltd.*, 2004 WL 733844, at *11 (citing 10A WRIGHT, MILLER, KANE &

4

MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2685).

Here, Plaintiff brings several causes of action against Defendant for violations of the Lanham Act, 15 U.S.C. § 1051 *et seq.*,[5] the Anticybersquatting Consumer Protection Act (ACPA), 15 U.S.C. § 1125(d),[6] and Texas common law. (*See* doc. 27.) Plaintiff seeks injunctive relief, $200,000 in statutory damages, transfer of <leedintl.com> and <leedintl.net> to it, $77,007.60 in attorney's fees, and $2,127.29 in costs.[7] (doc. 52-1.) Regarding the first factor, although the amount of money involved substantial, it is not dispositive. Under the second factor, there is a public interest in protecting trademarks. Third, Defendant's default is not merely technical in nature, since he has failed to file an answer in over a year, had a prior default set aside, and failed to answer after an extension was granted. (*See* docs. 25, 31, 46, 50-52.) Fourth, Plaintiff is prejudiced and harmed by Defendant's continued delay while he continues to use the trademarks and internet domain names. *See U.S. v. Fincanon*, No. 7:08–CV–61–O, 2009 WL 301988, at *2 (N.D. Tex. Feb. 6, 2009) (holding that a plaintiff's interests were prejudiced because the defendant's failure to respond brought the adversary process to a halt). Fifth, the grounds for default are clearly established.

---

[5] The Lanham Act is "[a] 1946 federal statute that provides for a national system of trademark registration and protects the owner of a federally registered mark against the use of similar marks if any confusion might result or if the strength of a strong mark would be diluted." *Lanham Act*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[6] The ACPA added § 43(d) to the Lanham Act, which "makes it illegal to register, traffic in, or use a domain name which is identical or confusingly similar to a distinctive mark or which is identical or confusingly similar to or dilutive of a famous mark, with a bad faith intent to profit from that mark, including a personal name which is protected as a mark." *Neutron Depot, LLC v. Bankrate, Inc.*, No. 2:14-CV-192, 2016 WL 215544, at *1 n.2 (S.D. Tex. Jan. 19, 2016) (citation omitted); *see ACPA*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[7] Plaintiff's brief requests only $1,995.29 (doc. 52-1 at 29), however, the *Declaration of Amanda L. Deford in Support of Plaintiff's Motion for Default Judgment* avers that McGuireWoods billed Plaintiff a total of $2,127.29 in costs (doc. 52-2 at 2) and the provided billing statements reflect the $2,127.29 total (doc. 52-7 at 24-25).

Regarding the sixth factor, Defendant has had ample time to answer, so a default judgment is not unusually harsh under these facts. *See Lindsey*, 161 F.3d at 893. Seventh, Defendant has not offered any evidence that his failure to answer was the product of a good faith mistake or excuse. Eighth, Plaintiff has not contributed to the delay in this case. Ninth, under the facts of this case, the court will not be obligated to set aside the default.

No material issues of fact have been placed in dispute due to Defendant's failure to respond to the amended complaint. *See Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) (noting that "[t]he defendant, by his default, admits the plaintiff's well pleaded allegations of fact"). Because he was properly served with the amended complaint and failed to answer or otherwise defend in this action, the grounds for default judgment are clearly established. (doc. 31.) Finally, there appears to be no reason why the default would be set aside. Accordingly, the procedural prerequisites for a default judgment are satisfied.

**B.     Relief**

In awarding relief, "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c). The relief requested in a plaintiff's amended complaint limits the relief available in a default judgment. *See Sapp v. Renfroe*, 511 F.2d 172, 176 n. 3 (5th Cir. 1975). Because the requested relief does not differ in kind from, or exceed in amount, what is demanded in the pleadings, the only issue to consider is whether the relief requested is appropriate based on the governing law. *Chevron Intellectual Property, LLC v. Allen*, No. 7:08–CV–98–O, 2009 WL 2596610, at *3 (N.D. Tex. Aug. 24, 2009).

   *1.     Permanent Injunction*

Plaintiff first requests a permanent injunction enjoining and restraining:

6

> Defendant, his agents, servants, employees, subsidiaries, affiliates, and all persons in active concert or participation with, through, or under any of them, at first during the pendency of this action and thereafter perpetually:
>
> > 1. from committing any acts of trademark infringement, trademark dilution, cybersquatting, unfair competition and from implying a false designation of origin or a false description or representation with respect to the LEED Mark, any member of USGBC's LEED Family of Marks or USGBC's Design Marks;
> >
> > 2. from using in any manner packaging, labels, signs, literature, display cards, Internet website, or other packaging, advertising, or promotional materials, or other materials related to Leed International's goods or services, bearing the LEED Mark, any member of USGBC's LEED Family of Marks, the USGBC Design Marks, or any other mark, word, or name confusingly similar to any of those marks;
> >
> > 3. from making any statements on promotional materials or advertising for Defendant's goods or services that are false or misleading as to source or origin or affiliation with, sponsorship by, or connection to USGBC or USGBC's LEED certification program; and
> >
> > 4. from using any designation that is likely to disparage, tarnish or dilute the distinctive quality of the LEED Mark.

(docs. 27 at 25; 52-1 at 25.)

Under 15 U.S.C. § 1116(a), a court has the power to grant a permanent injunction for a violation of the Lanham Act. A permanent injunction is appropriate if a plaintiff can prove: (1) actual success on the merits; (2) no adequate remedy at law; (3) that the threatened injury to the plaintiff outweighs any damage to the defendant; and (4) that the injunction will not disserve the public interest. *See Playboy Enters., Inc. v. Webbworld, Inc*., 991 F. Supp. 543, 561 (N.D. Tex. 1997), *aff'd*, 168 F.3d 486 (5th Cir. 1999) (citations omitted).

Courts have acknowledged that default against a defendant is tantamount to actual success on the merits and that a permanent injunction may be issued as part of a default judgment. *See, e.g.,*

7

*Twist & Shout Music v. Longneck Xpress, N.P.*, 441 F. Supp. 2d 782, 785 (E.D. Tex. 2006). The first prong has therefore been satisfied in this case. *Id.*; *United State 'ex rel' M-Co Constr., Inc. v. Shipco Gen., Inc.*, 814 F.2d 1011, 1014 (5th Cir. 1987). As for the second prong, Plaintiff has no other adequate remedy at law because monetary damages will not prevent future infringing activity by Defendant. *See, e.g., W.B. Music Corp. v. Big Daddy's Entm't, Inc.*, No. EP–05–CA–267–PRM, 2005 WL 2662553, at *3 (W.D. Tex. Oct. 18, 2005). Additionally, there has been no showing that requiring Defendant to restrain from future infringement will cause him harm, and any potential harm caused by requiring him to comply with the law is insignificant compared to the continuing harm to Plaintiff's business if the injunction is not granted. Fourth, an injunction would serve the public interest by promoting compliance with intellectual property law. *See Arista Records, Inc. v. Kabani*, No. 3:03-CV-1191-H, 2004 WL 884445, at *4 (N.D. Tex. Apr. 23, 2004). Accordingly, Plaintiff's request for a permanent injunction is appropriate and should be granted.

In addition to the permanent injunction, Defendant should also be ordered to deliver to Plaintiff within 30 days any and all containers, signs, packaging materials, printing plates, and advertising or promotional materials and any materials used in the preparation thereof, which in any way unlawfully use or make reference to the LEED mark, any of LEED family of marks, the LEED tagline, or the USGBC design marks in connection with Defendant's goods or services.

### 2. *Statutory Damages*

Plaintiff also seeks statutory damages for the use of the internet domain names <leedintl.com> and <leedintl.net>. (docs. 27 at 26; 52-1 at 26-27.)

Under the ACPA, the prevailing "plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory

damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just." 15 U.S.C. § 1117(d); *accord Kiva Kitchen & Bath Inc. v. Capital Distributing Inc.*, 319 F. App'x 316, 319 (5th Cir. 2009). Courts enjoy broad discretion in awarding damages within this range and "the [trial] court . . . [is] constrained only by the specified maxima and minima." *Kiva Kitchen & Bath Inc.*, 319 F. App'x at 320 (citations omitted). The ACPA does not provide guidance for determining an appropriate amount of statutory damages. *See* 15 U.S.C. § 1117(d). Courts have therefore looked to damages awards assessed under the Copyright Act. *See E. & J. Gallo Winery v. Spider Webs Ltd.*, 286 F.3d 270, 277-78 (5th Cir. 2002) (noting that "[t]he statutory damages provisions in the ACPA . . . are akin to the statutory damages provisions of the copyright laws," and looking to Copyright Act authority to affirm the trial court's award of statutory damages); *Philip Morris USA Inc. v. Lee*, 547 F. Supp. 2d 685, 695 (W.D. Tex. 2008) (applying Copyright Act authority to determine amount of statutory damages for Lanham Act violations).

Factors considered under the Copyright Act include a defendant's profits, saved expenses, a plaintiff's lost revenues, and a defendant's state of mind. *Philip Morris USA Inc.*, 547 F. Supp. 2d at 695. Courts also consider whether a defendant has cooperated in providing records from which to assess the value of the infringing material and also the potential for discouraging a defendant from engaging in similar behavior going forward. *Neutron Depot, LLC*, 2016 WL 215544, at *3-4 (citing *Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co.*, 807 F.2d 1110, 1117 (2d Cir. 1986)).

Here, Plaintiff elects statutory damages and requests the maximum amount allowed under the statute. (doc. 52 at 2-3.) It relies on the allegations in its complaint that Defendant is still using the domain names and its marks on the website, and that his violation of the ACPA was willful and blatant. (docs. 27 at 1-27; 27-2 at 2-25; 52-1 at 26-27.) While there is no evidence of Defendant's

state of mind, "some courts have found that defendants are deemed to have admitted they acted knowingly and intentionally by virtue of their default." *See Neutron Depot, LLC*, 2016 WL 215544, at *4 (citing *Sculpt, Inc. v. Sculpt New York, LLC*, No. H-14-3398, 2015 WL 6690224, at *5 (S.D. Tex. 2015); *Malletier v. Carducci Leather Fashions, Inc.*, 648 F. Supp. 2d 501, 504 (S.D.N.Y. 2009)); *see also Doctor's Associates, Inc. v. Vinnie's Smokehouse/Meat Specialty, LLC*, No. 10-3661, 2011 WL 1226485, at *2 (E.D. La. 2011) ("Willful copyright infringement is considered proven even when the defendant has defaulted.")).

Because Defendant's conduct was willful and he admitted that he acted knowingly and intentionally by virtue of his default, an award of statutory damages against Defendant in the maximum amount is warranted.[8] This amount will compensate Plaintiff and discourage wrongful conduct in the future. *See Kiva Kitchen & Bath Inc.*, 319 F. App'x at 320-21 (noting the ACPA's purpose to compel restitution, make reparations of injury, and "discourage wrongful conduct.") (citing cases with maximum statutory awards under the ACPA). Plaintiff should be awarded $100,000 in statutory damages under 15 U.S.C. 1117(d) per internet domain, and Defendant should be ordered to pay $200,000 in statutory damages to Plaintiff.

*3.    Transfer of Domain Names*

Plaintiff also seeks the immediate transfer of Defendant's ownership of the second level

---

[8] Normally, damages are not awarded without a hearing or a demonstration by detailed affidavits establishing the necessary facts. *Future World Elecs., LLC*, 2013 WL 5925089, at *3 (citing *United Artists Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir. 1979)). If the amount of damages can be determined with mathematical calculation by reference to the pleadings and supporting documents, a hearing is unnecessary, however. *James v. Frame*, 6 F.3d 307, 310 (5th Cir. 1993); *Future World Elecs., LLC*, 2013 WL 5925089, at *3. Here, as a basis for its statutory damages request, Plaintiff relies only on facts ascertainable from its complaint. Because Defendant, by his default, admits Plaintiff's the well-pleaded allegations of fact, a hearing is unnecessary.

10

internet domains <leedintl.com> and <leedintl.net> to Plaintiff.[9] (doc. 52-1.)

Under the ACPA, "[i]n any civil action involving the registration, trafficking, or use of a domain name under this paragraph, a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." 15 U.S.C. § 1125(d)(1)(C); *see E. & J. Gallo Winery v. Spider Webs Ltd.*, 129 F. Supp. 2d 1033, 1047 (S.D. Tex. Jan 29, 2001), *aff'd*, 286 F.3d 270, 278 (5th Cir. 2002). Federal courts have previously recognized that domain names that are substantially the same as a trademark are confusingly similar and create a presumption of confusion. *Texas Intern. Prop. Assocs.*, 624 F. Supp. 2d at 588 (citing cases).

Here, Defendant's registered domain names incorporate Plaintiff's famous LEED tagline, and his website utilizes other marks. As noted, some courts have found that defendants are deemed to have admitted they acted knowingly and intentionally by virtue of their default. *Neutron Depot, LLC*, 2016 WL 215544, at *4; *Sculpt, Inc.*, 2015 WL 6690224, at *5. Because Defendant is deemed to have acted knowingly and intentionally, transfer of the domain names <leedintl.com> and <leedintl.net> to Plaintiff is appropriate. Defendant should be ordered to immediately transfer the registered domain names <leedintl.com> and <leedintl.net> to Plaintiff.

### III. ATTORNEY'S FEE'S AND COSTS

Plaintiff seeks attorney's fees in the amount of $77,007.60 and costs in the amount of $2,127.29. (docs. 27 at 26; 52-1 at 28-29; 52-7.)

---

[9] "Internet website operators register domain names that identify the address where a specific website can be found." *GoForIt Entertainment, LLC v. DigiMedia.com L.P.*, 750 F. Supp. 2d 712, 718 (N.D. Tex. 2010). Domain names consist of at least a top level domain, such as ".com" or ".net," and a second level domain. *Id.* Second level domain names appear to the left of the top level domain. *Id.* For example, the designation "uscourts" in "uscourts.gov" reflects the second level domain names, while ".gov" represents the top level domain name. *See id.* Defendant's registration of <leedintl.net> and <leedintl.com> second level domain names are at issue in this case. (*See* doc. 27 at 10.)

**A.      Attorney's Fees**

A district court should award reasonable attorney's fees in a trademark infringement case if such relief is appropriate under the Lanham Act. *Chevron Intellectual Property, LLC*, 2009 WL 2596610, at \*3. The Lanham Act gives district courts the discretion to award attorney's fees to the prevailing party in exceptional cases. 15 U.S.C. § 1117(a). The Fifth Circuit has acknowledged that "the exceptional case is one in which the defendant's trademark infringement can be characterized as 'malicious,' 'fraudulent,' 'deliberate,' or 'willful.'" *Tex. Pig Stands, Inc. v. Hard Rock Café Int'l, Inc.*, 951 F.2d 684, 697 (5th Cir. 1992). Several district courts within the Fifth Circuit have held that defendants are deemed to have admitted they acted knowingly and intentionally by virtue of their default. *Neutron Depot, LLC*, 2016 WL 215544, at \*4; *Sculpt, Inc.*, 2015 WL 6690224, at \*5; *see also Philip Morris USA*, 547 F. Supp. 2d at 681 ("Evidence of intentional infringement has been held to establish an exceptional case."). Because Defendant is deemed by his default to have conceded that he acted knowingly and intentionally when he infringed on Plaintiff's trademarks, Plaintiff is entitled to attorney's fees under 15 U.S.C. § 1117(a).

In adjudicating an attorney's fee award, a court first calculates a "lodestar" fee by multiplying the reasonable number of hours expended on the case by the reasonable hourly rates for the participating lawyers. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir. 1995). The fee applicant bears the burden of proof on this issue. *See Riley v. City of Jackson*, 99 F.3d 757, 760 (5th Cir. 1996); *Louisiana Power & Light Co.*, 50 F.3d at 324. In the second step of the lodestar method, a court must consider whether the lodestar figure should be adjusted upward or downward depending on its analysis of the twelve factors established in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th

12

Cir. 1974).[10] *Riley*, 99 F.3d at 760; *Louisiana Power & Light Co.*, 50 F.3d at 331. "Many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate and should not be double-counted." *Jason D.W. v. Houston Indep. Sch. Dist.*, 158 F.3d 205, 209 (5th Cir. 1998) (internal citations omitted). The most critical factor in determining the reasonableness of an attorney's fee award is the degree of success obtained. *Hensley*, 461 U.S. at 436.

### 1. The Lodestar

In support of its application, Plaintiff submits time records from April 10, 2014 through October 8, 2015, a declaration, and resumes for eight attorneys. (*See* docs. 52-2, 52-7, 52-8.)

#### a. Reasonable hourly rates

Plaintiff has the burden of showing that its attorneys' hourly rates are reasonable. *La. Power & Light Co.*, 50 F.3d at 324. "Typically, the Court receives copies of resumes or summaries of the qualifications of attorneys involved in the litigation, as well as information regarding the individuals' litigation skills generally." *Neles–Jamesbury, Inc. v. Bill's Valves*, 974 F. Supp. 979, 987 n.19 (S.D. Tex. May 30, 1997). Further, "[t]o inform and assist the court in the exercise of its discretion [in analyzing reasonable hourly rate], the burden is on the fee applicant to produce satisfactory evidence—*in addition to the attorney's own affidavits*—that the requested rates are in

---

[10] The twelve factors are: (1) the time and labor required for the litigation; (2) the novelty and difficulty of the questions presented; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the result obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Cobb v. Miller*, 818 F.2d 1227, 1231 n.5 (5th Cir. 1987) (citing *Johnson*, 488 F.2d at 717-19).

line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation. A rate determined in this way is normally deemed to be reasonable, and is referred to—for convenience—as the prevailing market rate." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984) (emphasis added); *see Tollett v. City of Kemah*, 285 F.3d 357, 368 (5th Cir. 2002) ("Generally, the reasonable hourly rate for a particular community is established through affidavits of other attorneys practicing there."); *Watkins v. Fordice*, 7 F.3d 454, 458 (5th Cir. 1993).

### *i.  Attorneys*

Plaintiff seeks rates between $499.50 and $778.50 per hour for individuals identified as "partners" and "counsel" at McGuireWoods, and rates between $283.50 and $450 per hour for associates. (doc. 52-2 at 2.) It proffers biographical information and a declaration stating that McGuireWoods' requested fees are "conservative, fair and reasonable", but it provides no evidence regarding the prevailing market rate for this type of case or for lawyers of similar skills, experience, and reputation in the Dallas community.[11] (doc. 52-2 at 1-3.)

Some of the rates requested by Plaintiff are higher than rates previously accepted in the Dallas area for similar matters. *See Spear Marketing, Inc. v. Banscorpsouth Bank*, 3:12-CV-3583-B, 2016 WL 193586, at *9-10 (N.D. Tex. Jan. 14, 2016) (finding a reasonable hourly rate for copyright litigation in the Dallas area was between $150 and $400 per hour for attorneys and $100 per hour for paralegals, and noting that rates above $500 per hour are reserved for complex cases that few attorneys can handle) (citing cases); *see also SortiumUSA, LLC v. Hunger*, No. 3:11–CV–1656–M,

---

[11] "Hourly rates are to be computed according to the prevailing market rates in the relevant legal market, not the rates that 'lions at the bar may command.'" *Hopwood v. Texas*, 236 F.3d 256, 281 (5th Cir. 2000) (citation omitted).

14

2015 WL 179025, at *5-7 (N.D. Tex. Jan. 14, 2015) (awarding attorney's fees at rates of $325 and $202.50 per hour in a copyright case) (citing *Fluor Corp. v. Citadel Equity Fund Ltd.*, No. 3:08-CV-1556-B, 2011 WL 3820704, at *5 (N.D. Tex. Aug. 26, 2011) (collecting cases with hourly rates ranging to $510 for senior partners performing premium work requiring specialized qualifications)); *cf. Neutron Depot, LLC*, 2016 WL 258343, at *4 (finding that a standard hourly rate of $375 per hour was reasonable for an attorney trademark infringement under the ACPA in the Southern District of Texas); *Kiva Kitchen & Bath, Inc. v. Capital Distributing, Inc.*, 681 F. Supp. 2d 807, 814 (S.D. Tex. 2010) (finding that hourly rates of $165 to $175 for paralegals, $225 to $275 for associate attorneys, $375 for an of counsel attorney, and $500 to $525 for partners in Houston was reasonable for a Lanham Act and ACPA case).[12] Because some of the hourly rates requested by Plaintiff are above the hourly rates recently accepted within the Dallas area and by other federal district courts in Texas, some of the requested rates are unreasonable. Taking into account the hourly rates for attorneys in other cases and the biographical information, the hourly rates of Mr. Riopelle and Ms. Calleja should be reduced to $500 an hour, and Mr. Duddlesten's hourly rate should remain at $499.50 per hour. Additionally, the hourly rates of Mr. Pickell, Mr. Federspiel, and Mr. Misha should be reduced to $300. The hourly rates of Ms. Napoleon should remain at $288 per hour and the hourly rate of Ms. DeFord should remain at $283.50 per hour.

### ii. *Individuals without resumes*

The billing statements also show that Plaintiff is requesting between $180 and $535.50 for

---

[12] Some federal district courts have noted that "markets of comparable sizes can be informative in determining the prevailing market rate of another district." *Ball v. Leblanc*, No. 13–00368–BAJ–SCR, 2015 WL 4454779, at *3 (M.D. La. July 20, 2015) (citations omitted).

11.4 hours incurred by five individuals with unspecified job titles.[13] (*See* doc. 52-7 at 24.) Plaintiff provided no resume or biographical information for any of these five individuals, and its supporting declaration does not specifically address them. (*See* doc. 52-2.) Without any biographical or basic information, including job title, Plaintiff has not shown that the requested hourly rates are reasonable. *S & H Indus., Inc.*, 2013 WL 6332993, at *3 (noting that the lack of biographical information about an associate attorney "undermines" the requested hourly rate). Nor has it provided any basis for a reduction in fees. Accordingly, no fees should be awarded for them.

### b. Reasonable Number of Hours

In order to determine the reasonable number of hours expended in a case, "[t]he party seeking attorney's fees must present adequately documented time records to the court." *Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir. 1993). "[T]he documentation must be sufficient for the court to verify that the applicant has met its burden." *Louisiana Power & Light Co.*, 50 F.3d at 325 (citation omitted). Contemporaneous billing records are acceptable documentation for determination of reasonable hours. *See Bode v. United States*, 919 F.2d 1044, 1047 (5th Cir. 1990).

Here, Plaintiff submitted copies of attorney invoices with detailed time entries, covering the period from April 4, 2014 through October 8, 2015. (doc. 52-7 at 1-25.) Its billing statements reflect 221.8 hours for a total of $77,007.60: 1.0 hour at $778.50; 4.8 hours at $625.50; 1.9 hours at $585; 0.4 hours at $535.50; 1.0 hour at $499.50; 2.3 hours at $450; 17.1 hours at $423; 15.1 hours at $409.50; 61.5 hours at $382.50; 15.1 hours at $355.50; 23.3 hours at $288; 67.3 hours at $283.50; 0.5 hours at $229.50; 5.9 hours at $216; 1.4 hours at $211.50; 0.3 hours at $202.50; and 2.9 hours

---

[13] The five individuals are Janet P. Peyton, Elizabeth W. Davenport, Shanna L. Eisenhauer, Bryan R. Portillo, and Gregory Stoner.

16

at $180. (*Id.* at 24.)

Additionally, "plaintiff [is] charged with the burden of showing the reasonableness of the hours [it] bill[s] and, accordingly, [is] charged with proving that [it] exercised billing judgment." *Walker v. U.S. Dept. of Housing and Urban Development*, 99 F.3d 761, 769 (5th Cir. 1996). Billing judgment "refers to the usual practice of law firms in writing off unproductive, excessive, or redundant hours[, and p]laintiffs submitting fee requests are *required* to exercise billing judgment." *Id.* (emphasis added). "The proper remedy for omitting evidence of billing judgment does not include a denial of fees but, rather, a reduction of the award by a percentage intended to substitute for the exercise of billing judgment." *Saizan v. Delta Concrete Products Co., Inc.*, 448 F.3d 795, 799 (5th Cir. 2006) (per curiam); *see, e.g., Walker*, 99 F.3d at 770 (reduced applicants requested fees by 15% "to substitute for the exercise of billing judgment" of the plaintiff's attorney); *Leroy v. City of Houston*, 831 F.2d 576, 585-86 (5th Cir. 1987) (ordering a 13% reduction when plaintiff's attorney made no reduction to the lodestar for billing judgment); *Saizan v. Delta Concrete Products Co.*, 448 F.3d 795 (5th Cir. 2006) (per curiam) (affirmed a 10% reduction by the trial court because the plaintiff failed to provide evidence of billing judgment); *Mauricio v. Phillip Galyen, P.C.*, No. 3:14-CV-64-L, 2016 WL 1273337 (N.D. Tex. Mar. 30, 2016) (noting that a voluntary reduction of 20% was consistent with the exercise of billing judgment).

Here, the records do not reflect the exercise of billing judgment. The records reflect an excessive amount of time between multiple individuals reviewing the same documents and discussing the case among themselves. (*See* doc. 52-7). A reduction of fifteen percent is therefore appropriate given the facts of this case. *See Walker*, 99 F.3d at 770 (reducing the hours by 15%). Accordingly, Plaintiff's lodestar amount is $53,949.03.

17

### *2. Adjustment to lodestar*

Next, a court must determine whether the lodestar value should be adjusted based on the twelve *Johnson* factors. *See Johnson*, 488 F.2d at 717-19. If a particular factor is subsumed in the lodestar, it may not be used to adjust the lodestar amount. *See Migis v. Pearle Vision*, 135 F.3d 1041, 1047 (5th Cir. 1998) (citing *Shipes v. Trinity Indus.*, 987 F.2d 311, 320 (5th Cir. 1993)). Neither party argues for an adjustment to the lodestar, and there is a strong presumption that the lodestar figure represents a reasonable attorney's fee. *R.M. Perez & Assocs., Inc. v. Welch*, 960 F.2d 534, 541 (5th Cir. 1992). The *Johnson* factors, are accurately reflected in the lodestar amount and no departure is necessary. Plaintiff should be awarded $53,949.03 in attorney's fees.

### B. Costs

Plaintiff seeks $2,127.29 for "filing fees, service of process, and other costs in this case." (docs. 52-1 at 29; 52-7 at 24-25.) It submitted billing statements reflecting this total. (doc. 52-7 at 24-25.) The motion for these requested costs should be granted.

### IV. RECOMMENDATION

Plaintiff's motion for default judgment should be **GRANTED**, and a permanent injunction should be entered, prohibiting Defendant, his agents, servants, employees, subsidiaries, affiliates, and all persons in active concert or participation with, through, or under any of them from:

> (1) committing any acts of trademark infringement, trademark dilution, cybersquatting, unfair competition and from implying a false designation of origin or a false description or representation with respect to the LEED Mark, any member of USGBC's LEED Family of Marks or USGBC's Design Marks;
>
> (2) using in any manner packaging, labels, signs, literature, display cards, Internet website, or other packaging, advertising, or promotional materials, or other materials related to Leed International's goods or services, bearing the LEED Mark, any member of USGBC's LEED Family of Marks, the USGBC Design Marks, or any

18

other mark, word, or name confusingly similar to any of those marks;

(3) making any statements on promotional materials or advertising for Defendant's goods or services that are false or misleading as to source or origin or affiliation with, sponsorship by, or connection to USGBC or USGBC's LEED certification program; and

(4) using any designation that is likely to disparage, tarnish or dilute the distinctive quality of the LEED Mark.

The order of injunction should also require that Defendant file with the Court and serve upon counsel for Plaintiff a written report, sworn under oath, setting forth in detail the manner and form in which Defendant has complied with the injunction within 30 days after the entry of the permanent injunction.

Defendant also should be ordered to deliver Plaintiff within 30 days any and all containers, signs, packaging materials, printing plates, and advertising or promotional materials and any materials used in the preparation thereof, which in any way unlawfully use or make reference to the LEED Mark, any of USGBC's LEED Family of Marks, the LEED Tagline, or the USGBC Design Marks in connection with Defendant's goods or services.

Defendant should also be ordered to pay Plaintiff $200,000 in statutory damages under 15 U.S.C. § 1117(d) for his bad faith registration and use of <leedintl.com> and <leedintl.net>, and to immediately transfer the registered domain names <leedintl.com> and <leedintl.net> to Plaintiff.

Finally, Plaintiff should be awarded $53,949.03 in attorney's fees and $2,127.29 in costs.

**SO RECOMMENDED** on this 17th day of June, 2016.

*[signature]*
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND**
**NOTICE OF RIGHT TO APPEAL/OBJECT**

      A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

                                                                                       _____
                                                                                        IRMA CARRILLO RAMIREZ
                                                                                        UNITED STATES MAGISTRATE JUDGE